UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LORRAINE LYONS,

                         Plaintiff,

        -v-

NEW YORK LIFE INSURANCE CO.,

                     Defendant.

20 Civ. 3120 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

This case involves claims of age discrimination and retaliation, made by an employee in the insurance industry. Plaintiff Lorraine Lyons worked for defendant New York Life Insurance Co. ("NYL" or "NY Life") as a Long-Term Care Consultant ("LTCC") between January 2014 and October 2018, when Lyons was terminated. She brings this action for violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") and the Washington Law Against Discrimination, Wash. Rev. Code § 49.60 *et seq.* ("WLAD"). She alleges that NYL discriminated against her based on her age and retaliated against her for complaining about that discrimination.

With discovery complete, NYL has moved on multiple grounds for summary judgment on Lyons's claims. Lyons counters that disputes of material fact preclude summary judgment. For the following reasons, the Court grants NYL's motion as to its federal claims and declines to exercise supplemental jurisdiction over Lyons's state-law claims.

## I.      Background

### A.      Factual Background[1]

#### 1.      The Parties

NYL is a mutual insurance company that "markets and issues life insurance, annuities, and other insurance and financial products." JSF ¶ 1. Its internal policies, available on its intranet, prohibit employment discrimination, harassment, and retaliation, and provide ways to report any such issues. Def. 56.1 ¶¶ 1–2.

In January 2002, Lyons began working for NYL. She worked as an Agent and, beginning in 2009, as an LTCC, before she was laid off in 2013. JSF ¶¶ 15–16; Def. 56.1 ¶ 7. On January 28, 2014, she was offered a position as an LTCC, which she accepted. JSF ¶¶ 20, 23. At the time of her re-hire by NYL, she was age 48. *Id.* ¶ 22; Pl. 56.1 ¶ 90.

---

[1] The Court draws its account of the underlying facts from the parties' respective submissions on the motion for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 71 ("JSF"); defendant's Local Rule 56.1 statement, Dkt. 74 ("Def. 56.1"); plaintiff's statement of additional material facts, Dkt. 157 ("Pl. 56.1"); plaintiff's counter-statement, Dkt. 160 ("Pl. Counter 56.1"); defendant's reply to plaintiff's additional material facts and counter-statement, Dkt. 163 ("Def. Reply 56.1"); the declarations of Jade Yee, Dkt. 75 ("Yee Decl."), Brian Seguin, Dkt. 76 ("Seguin Decl."), Courtney Crenshaw, Dkt. 78 ("Crenshaw Decl.") and Beth McGrath in support of defendant's motion, Dkt. 80 ("McGrath Decl."), and their attached exhibits; the declarations in opposition to defendant's motion of Lorraine Lyons, Dkt. 156 ("Lyons Decl."), Steve Buell, Dkt. 158 ("Buell Decl."), and Armand Zappa, Dkt. 159 ("Zappa Decl."), and attached exhibits; and the reply declarations of Jade Yee, Dkt. 164 ("Yee Reply Decl.") and Brian Seguin, Dkt. 165 ("Seguin Reply Decl.") and attached exhibits.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The ensuing account of Lyons's tenure, and the experiences of purported comparators at NYL, is long.  As an overview, Lyons argues that her October 2018 termination resulted from age discrimination, based on the nature of her and others' work assignments; evaluations of her work; comments by NYL executives; the pattern of promotions; and her supervisors' ostensible failure adequately to support and coach her.  She argues that, in general, there was a concerted campaign at NYL to make the workforce younger, of which her termination was a part.

### 2.    Long-Term Care Consultants at NY Life

LTCCs are part of NYL's Long Term Care division.  JSF ¶ 2.  They work with sales agents in their assigned general offices.  *Id.* ¶ 3.  Although they work with different agents and in different general offices, "[a]ll LTCCs generally perform the same job functions." *Id.* ¶ 5.

#### *a.    LTCCs' supervisory line*

Until 2018 and at all relevant times, there were 16 LTCCs, split into two teams, each led by a Regional Manager.  *Id.* ¶ 4.  Each LTCC reports to the Regional Manager leading his or her team.  *See id.*  The two Regional Managers report to Brian Seguin, a Vice President and National Sales Officer.  *Id.* ¶ 6.  Seguin began working at NYL on September 9, 2013, after leaving Genworth Financial, Inc. ("Genworth").  *Id.* ¶ 8; Seguin Decl. ¶ 1; Pl. 56.1 ¶ 91.[2]  Between January 1, 2014, and March 1, 2019, Seguin hired four LTCCs who were under age 40.  Pl. 56.1 ¶ 108; Def. Reply 56.1 ¶ 108.

Beginning on July 10, 2017, Seguin reported to Alise Civello, National Sales Manager for Investments and Long Term Care.  Def. 56.1 ¶ 3; Pl. Counter 56.1 ¶ 3; Seguin Decl. ¶ 7.  In 2017 and 2018, Civello reported to Sonali Virendra, Senior Vice President of Agency Sales.  JSF

---

[2] Seguin's declaration has two paragraphs numbered one.  The Court here refers to the second of those two paragraphs.

¶ 10; Seguin Decl. ¶ 7. Seguin was born in 1970; in October 2018, he was age 48. JSF ¶ 7; Seguin Decl. ¶ 2. In October 2018, Civello and Virendra were both age 47. JSF ¶¶ 9, 11.

            b.    *LTCC performance metrics*

Each year, each LTCC is given a "uniform target percentage growth," or "Plan"; her performance is measured in part on such growth. *See id.* ¶¶ 12–13; Def. Mem. at 2. "Percentage growth" refers to the production of an LTCC in any given year as a percentage of the production the year before. Def. 56.1 ¶ 4. The uniform target percentage applies to NYL's traditional, or "flagship," long-term care insurance ("LTCi") products—which include Select Premier, Secure Care, and MyCare—along with Asset Preserver, Asset Flex, and Chronic Care Rider products. JSF ¶ 14; Def. 56.1 ¶ 5.[3]

Under Seguin's policies, an LTCC who does not meet her performance goals in her assigned territory is issued a memorandum of understanding ("MOU"), which sets forth goals for the LTCC. Def. 56.1 ¶ 22. Seguin issues such MOUs with the input of Human Resources and the LTCC's Regional Manager. Yee Decl., Ex. D ("Seguin Tr.") at 60–61;[4] *see* Def. 56.1 ¶ 60; Pl. Counter 56.1 ¶ 60. If the goals of an MOU are not met, the MOU may be extended through to a "Final Warning" MOU. Pl. Counter 56.1 ¶ 22. "Final Warning" MOUs note that if the goals continue not to be met, the LTCC may be subject to termination. *Id.*; *see* Seguin Decl., Ex. J at 8 (example of Final Warning MOU). However, an LTCC is typically not issued an MOU in

---

[3] Seguin claims that, as flagship products, LTCi products are weighted more heavily when evaluating LTCC performance, Seguin Decl. ¶ 10, although Lyons testified that in some years Asset Preserver was weighted more heavily and in some years it was equal with LTCi, Yee Decl. Ex. A ("Lyons Tr.") at 101. This distinction is not relevant to the instant motion.

[4] Excerpts of the same transcript are also designated at Zappa Decl., Ex. 19 and Yee Reply Decl., Ex. D.

her first year working in a given territory, because it may take time for an LTCC to establish herself. Pl. Counter 56.1 ¶ 21.

### 3.    Lyons's 2014 Hire as an LTCC

In late 2013, following her layoff earlier in the year, Ramon, or "Ray," Singer, who was then a Regional Manager, asked Lyons if she was interested in rejoining NYL as an LTCC in the Pacific Northwest. JSF ¶ 17.[5] Lyons testified that Singer told her that Seguin, who had hired Singer to work at NYL in 2013, asked Singer to get in touch with Lyons. *Id.* ¶¶ 18–19. Lyons interviewed with Singer for the LTCC position. Def. 56.1 ¶ 8.

On January 28, 2014, Lyons was offered the LTCC position. JSF ¶ 20. Seguin made the decision to make that offer. Seguin Decl. ¶ 16. At that time, Seguin was age 43 and Lyons was age 48. JSF ¶¶ 21–22. When Lyons joined, she was assigned eight general offices: Greater Oregon, Eastern Washington, Seattle, Tacoma, Alaska, Montana, Wyoming, and Idaho. *Id.* ¶ 23. Seguin states, without refutation, that Lyons had covered "nearly all" of these territories before she was laid off in 2013. Seguin Decl. ¶ 20; *see* Pl. Counter 56.1 ¶ 10; Def. Reply 56.1 ¶ 10. She was paid a base salary of $80,000 and was eligible to receive additional compensation under the NYL Incentive Compensation Plan, based on a function of the total amount of premiums sold by the agents in the offices in her territory, and the percentage of premiums earned relative to the prior year's sales. JSF ¶¶ 25–26; Def. 56.1 ¶ 11.

---

[5] Singer was the Regional Manager for LTCCs in the Western Region of the country. The Eastern Region's Regional Manager was James Gerard, until he retired and was replaced by Dan Rivers. Pl. 56.1 ¶ 105; Def. Reply 56.1 ¶ 105.

### 4.    Lyons's 2014–2017 Tenure at NYL

From January 2014 through approximately January 2018, Lyons reported to Singer. JSF

¶¶ 24, 37.  Over these approximately four years, Singer travelled with Lyons only three times.

Pl. 56.1 ¶ 141.

In 2014, Lyons did not receive any negative documentation about her work or MOUs.

JSF ¶ 30.  She finished the year at 43% of Plan, or her required performance benchmark, in LTCi

and 38% of Plan in Asset Preserver.  Def 56.1 ¶ 20.[6]

In 2015, 10 LTCCs over age 40 (and five older than Lyons) were paid more than she.  Pl.

Counter 56.1 ¶ 16.  Seguin had hired five of those higher-paid LTCCs from Genworth, where he

had worked before NYL.  Id.[7]  One LTCC under age 40 had a lower salary than Lyons.  Id. ¶ 17.

In or about January 2015, Lyons had a conversation with Seguin about her salary.  JSF ¶

27; Pl. 56.1 ¶ 123.  She testified that she asked Seguin "why the men that he hired were being

paid [$]20,000 more than I was, and his response was, I had to pay them something to get them

to come here."  Lyons Tr. at 255;[8] see Def. 56.1 ¶ 12.  Those individuals had worked at

Genworth, Seguin's former company.  Lyons Tr. at 259, 265 (Lyons, attesting that Seguin

---

[6] Lyons contests this claim, arguing that she was "above Plan for each month of 2014 and finished the year at 392% [sic] of Plan, not 38%, for Asset Preserver."  Pl. Counter 56.1 ¶ 20 (emphasis omitted).  She cites to a document, "NYL 0043867," that is not in the record.  The Court therefore cannot credit this factual representation.  See Local Civ. R. 56.1(d); Fed. R. Civ. P. 56(c)(1)(A).  In any event, the dispute is immaterial to the instant motion, which, as explained infra § III.A.1, concerns Lyons's claims about her 2018 termination.

[7] At NYL, Seguin hired Paul Collard, Courtney Crenshaw, Jeff Garnica, Scott Nolen, Dan Rivers, and Jonathan Schwartz, each of whom had previously worked at Genworth.  Pl. 56.1 ¶ 102.

[8] The Court here cites to the transcript excerpt designated at Yee Decl., Ex. A.  Such transcript is also designated at Zappa Decl., Ex. 24 (filed under seal) and Yee Reply Decl., Ex. A.  The Court addresses the sealed portions of the transcript infra at III.C.  For ease of citation, the Court uses "Lyons Tr." for all references to the transcript herein.

referred to the "Genworth guys"), 278 (same); Seguin Decl. ¶ 21 ("Lyons asked me why certain individuals I had recruited from Genworth had a higher base salary than hers.").[9]  Lyons did not convey her concerns about the Genworth salaries to Human Resources. Def. 56.1 ¶ 19.  The day after Lyons and Seguin had this conversation, Singer, Lyons's manager, referred to Lyons as a "cancer." Pl. 56.1 ¶ 125.

In April 2015, Lyons's base salary increased to $90,000. JSF ¶ 28.  Also in April 2015, she received an MOU from Singer. Def. 56.1 ¶ 23; *see* Pl. 56.1 ¶ 126.  The MOU stated that, as of March 31, 2015, Lyons was at 81% of Plan for Select Premier, an LTCi product, and at 43% of Plan for Asset Preserver. Def. 56.1 ¶ 24.[10]

In September 2015, Lyons received another MOU from Singer. *Id.* ¶ 26; *see also id.* ¶¶ 27–28.  In December 2015, Lyons received a "Final Warning" from Singer. *Id.* ¶ 29.  It stated that Lyons would need to be at 100% of the last year's production, which revised her previous goals downward. *Id.* ¶ 31.  Lyons, however, ultimately met her 2015 MOU goals, and was not terminated. *Id.* ¶¶ 32–33; Pl. Counter 56.1 ¶ 32.

In 2016, Lyons did not receive any negative documentation about her work or any MOUs. JSF ¶ 31.  In 2017, NYL introduced a new product for its LTCCs, "Secure Care." *Id.* ¶ 32.  Lyons and 13 other LTCCs did not meet their 2017 performance target. *Id.* ¶ 33.  But Lyons did not receive any negative documentation about her work or an MOU in 2017; as Seguin

---

[9] Courtney Crenshaw, who became Lyons's supervisor after Singer, was not present for this conversation. Seguin did not tell her about it. Def. 56.1 ¶¶ 14–15.

[10] Lyons claims that the MOU calculated her results incorrectly, and it should have stated she was at 73% of Plan for Asset Preserver. Pl. Counter 56.1 ¶ 24.  She also wrote on the MOU that she had met her June 2015 numbers by May 8. Pl. 56.1 ¶ 130.  That is not material to the instant motion and does not contradict the MOU.

testified, no LTCCs were put on MOUs that year because the new product made it difficult for the LTCCs to meet their targets. *Id.* ¶¶ 34–35.

### 5.      Crenshaw's January 2018 Promotion

In January 2018, Singer, Lyons's supervisor, retired from NYL. JSF ¶ 37. He had announced his retirement at an all-consultant meeting. *Id.* ¶ 38. Seguin testified that the LTCCs were told that the position would be vacant and that NYL would be looking to replace him. *Id.* ¶ 39. Civello further testified that the job was posted internally and externally. *See* Def. 56.1 ¶ 35. Lyons knew that Singer's position was available in 2017. JSF ¶ 41.

About 33 candidates applied for the Regional Manager position. Def. 56.1 ¶ 38. Seguin and Civello interviewed several candidates for the post. JSF ¶¶ 43–44; Def. 56.1 ¶ 42. Courtney Crenshaw, an African-American woman who was age 41 at the time, applied, was interviewed, and chosen for the post. JSF ¶¶ 42–45. According to Seguin, who selected Crenshaw, Crenshaw was the best person for the role based on her experience, sales techniques, organization, and understanding of the LTCC role and products. Def. 56.1 ¶¶ 39–40; Seguin Decl. ¶¶ 30–31; *see also* Def. 56.1 ¶¶ 41, 43. Lyons did not apply for the post; she testified that Singer told her not to. Def. 56.1 ¶ 37; Pl. Counter 56.1 ¶ 37; Pl. 56.1 ¶ 138. Singer recalls telling Lyons that the job was Crenshaw's if she wanted it; he testified that he thought Crenshaw was the right person for the post based on her production, leadership, ideas, and enthusiasm. Yee Decl., Ex. C ("Singer Tr.") at 190; Def. 56.1 ¶ 44. Crenshaw thus started to manage Lyons. Pl. Counter 56.1 ¶ 45.

### 6.      Lyons's 2018 Tenure, Performance and Termination

In 2018, Lyons's base salary, $90,000, was lower than five LTCCs who were over age 40 years, including one LTCC who was older than Lyons. JSF ¶ 29. It was higher than those of six LTCCs younger than her, five of whom were under age 40. Def. Reply 56.1 ¶ 18.

a.    *Territory reassignments*

In early 2018, the territories and general offices of LTCCs were reassigned. JSF ¶ 46. Crenshaw testified that when "territory discussions" are occurring, it is standard operating procedure for an LTCC to maintain her offices until there is an official reassignment announced. Def. 56.1 ¶ 48. Neither Crenshaw nor Singer made territory assignment decisions. *Id.* ¶¶ 46–47.

On January 4, 2018, Lyons emailed Crenshaw about her potential work in Alaska, describing her metrics, her "momentum" and relationships in the office, the logistics of her work there, and stated that she was confident about her ability to "drive Alaska." *Id.* ¶ 52; Crenshaw Decl., Ex. A. She later testified, however, that she did not want Alaska relative to other offices. Lyons Tr. at 375. She also testified that she requested the Northern California office from a colleague. Pl. Counter 56.1 ¶ 53.

Lyons was thereafter assigned the general offices of Stockton (California) and Central California. JSF ¶ 47. By March 2018, Lyons's internal dashboard reflected that she was responsible for Alaska, Central California, Eastern Washington, Greater Oregon, Montana, Seattle, Stockton, Tacoma, Utah, and Wyoming, which included—relative to the territories she had been assigned in 2014—the two new California offices and Utah but no longer included Idaho. *See* Seguin Decl. Ex. H; JSF ¶ 23; Def. 56.1 ¶ 49.[11] Two of the offices—Seattle and Stockton—were "Tier 1" offices, in accordance with NYL's practice to assign most LTCCs two top offices. Def. 56.1 ¶ 57. Along with one other LTCC, her offices, at 10, were the most offices assigned to an individual LTCC. Pl. 56.1 ¶ 136.

---

[11] Lyons further testified that she had Wyoming in 2017, and "discovered" she still had it in March 2018. *See* Pl. Counter 56.1 ¶ 49. The parties disagree about when Steve Buell, Lyons's colleague, knew he would not be working in those territories. Def. 56.1 ¶ 51; Pl. Counter 56.1 ¶ 51. Buell did not do any work in Alaska or Wyoming, two of Lyons's territories, in 2018. Def. 56.1 ¶ 50.

9

Moreover, in 2018, at least three LTCCs younger than Lyons were assigned territories with less "tonnage"—meaning the amount of premiums provided the year before—than Lyons's territories. Def. 56.1 ¶¶ 54–55. Two LTCCs older than Lyons were assigned territories with more tonnage. *Id.* ¶ 56. One LTCC older than Lyons was assigned more Tier 1 offices than Lyons, and three LTCCs younger than Lyons were given fewer Tier 1 offices. *Id.* ¶¶ 58–59.

Lyons testified that Crenshaw told her that Michael Gregson, an LTCC under age 40, was given more productive general offices because he was a "stud"; Crenshaw disputes this. Pl. 56.1 ¶ 133; Yee Reply Decl. Ex. E ("Crenshaw Tr.") at 232. Gregson's California offices had 150% more tonnage than Lyons's California offices. Pl. 56.1 ¶ 134.

### b.    *Disciplinary action*

After the introduction of the Secure Care product and the LTCCs' poor performance in 2017, Seguin testified, NYL tightened its performance requirements so that there were "no excuses," and LTCCs had "got to be at [P]lan." JSF ¶ 35. Crenshaw similarly testified that "going into 2018, sales growth needed to increase in the first quarter," and all LTCCs were told this in January 2018. *Id.* ¶ 36. NYL claims that "[a]t all times in 2018, [Lyons] was consistently below her production goals." Def. 56.1 ¶ 61. Lyons responds that at some points during 2018, she exceeded Plan for a product in any given month. Pl. Counter 56.1 ¶ 61.[12] However, calculating her actuals as a percentage of the previous year overall to determine Lyons's percentage growth shows that she was never cumulatively at Plan.[13] At the end of February, Lyons was at about 70% of the previous year's LTCi production (compared to a Plan of 119%)

---

[12] Lyons also argues that NYL's ostensibly inaccurate statement to this effect is "a sanctionable offense," Pl. Counter 56.1 ¶ 61, but she has not so moved.

[13] For example, Lyons notes that she was at 167% of the prior year in March 2018. But as a total percentage of 2017 actuals, she was at only 98.5% of the prior year, which was 82.8% of Plan.

and 98% of the prior year's Asset Preserver and Asset Flex Production (compared to a Plan of 105%). Def. 56.1 ¶ 63; Pl. Counter 56.1 ¶ 63.

Seguin thus directed Crenshaw, as Lyons's Regional Manager, to prepare an MOU for Lyons. Def. 56.1 ¶¶ 65–66. Crenshaw and Seguin corresponded about how to generate Lyons's production numbers accurately given her new territories. Zappa Decl., Ex. 11.[14] Crenshaw testified that the MOU was approved by Seguin and Beth McGrath, who worked in Human Resources. Def. 56.1 ¶ 67; *see* McGrath Decl. ¶ 2.

On March 13, 2018, Lyons was issued an MOU (the "March MOU"), based on her 2017 and January and February 2018 performance. JSF ¶ 48. The March MOU was reissued on March 30, 2018, after a conversation between Lyons, Seguin, and Crenshaw, and continued to be based on Lyons's performance during 2017 and January and February 2018. *Id.* ¶ 49; Def. 56.1 ¶¶ 68, 70.

For the April 2, 2018 re-issued MOU (the "April MOU"), Lyons testified that Seguin agreed to use the production numbers that she told him she wanted him to use. Def. 56.1 ¶ 69. That MOU stated that, for the year of 2017, Lyons had been "below [her] LTCi sales goal of 116% ending at 65% of prior year's 2016 results" and that "[t]his sales trend has continued into the 1st Quarter of 2018 at 70% of your prior year's LTCi sales results and 98% of last year's

---

[14] Lyons claims that, in so doing, Crenshaw was attempting to paint Lyons's performance as bad. *See* Pl. 56.1 ¶¶ 151–52. The evidence does not support the inference that such—as opposed to arriving at an accurate tabulation—was Crenshaw's motive. On March 2, 2018, Crenshaw wrote to Seguin: "Working on Lorraine's MOU and the numbers aren't matching up in dashboard on the report for 4th qtr [sic] 2017. What do you have that shows her sales results for 4th qtr 2017 by month? Thanks". That evening, Seguin responded, "I'll work on it this weekend and send over. I'm pretty sure all I have to do is run the daily reports . . . and select the period I want. I'll try it out tomorrow." When Crenshaw reported two metrics, Seguin wrote back, "It's likely because it's going off her new territory I bet. I'll take a look at what I have. . . . Just put the dates/months you need production for in the MOU and we can get Lorraine's numbers." Zappa Decl., Ex. 11.

Asset Flex/Preserver Sales." *Id.* ¶ 71. The April MOU further stated that Lyons was expected to be at 99% of the prior year's sales for Secure Care and at 108% of the prior year's sales (or at Plan) for Asset Flex by the end of May. *Id.* ¶ 72. On April 12, 2018, Seguin and Lyons corresponded by email and Seguin agreed to use the number that Lyons specified for the end of May 2018. Zappa Decl., Ex. 3; Pl. 56.1 ¶¶ 155–56; Lyons Tr. at 390. On April 21, 2018, Lyons signed the April MOU. Pl. Counter 56.1 ¶ 73.

By the end of May 2018, Lyons was not at Plan, and Seguin directed Crenshaw to draft an extension of Lyons's MOU. Seguin Decl. ¶ 52. On June 13, 2018, Lyons was issued an MOU extension based on her performance from January to May 2018 (the "June MOU"). Def. 56.1 ¶ 75; Seguin Decl. ¶ 53. The June MOU was also reviewed and approved by Seguin and McGrath. JSF ¶ 52. It stated that, although Lyons had "shown some sales improvement, [her] overall performance is still not yet satisfactory" because LTCi sales were below Plan. Def. 56.1 ¶ 76. It further stated,

> if you do not demonstrate the ability to fulfill all the requirements of your position on a consistent and sustained basis, including but not limited to the areas noted above, by July 31, 2018, you will be subject to further corrective action, up to and including termination of your employment.

*Id.* ¶ 77 (emphasis omitted).[15]

On June 26, 2018, Lyons received the June MOU from Crenshaw. JSF ¶ 50. Crenshaw testified that she emailed Lyons that day and wrote, "Lorraine, Here's the extension of the MOU

---

[15] The June MOU had a typographical error indicating that Lyons was at 119%, or at Plan, for March, April, and May of 2018 for LTCi and 108%, or at Plan, for Asset Flex and Asset Preserver in the same period. Seguin Decl., Ex. O. Lyons acknowledged this. Pl. 56.1 at 12 n.9 (noting that "the chart showing Lyons to be at Plan was incorrect" but arguing that Seguin and Crenshaw did not tell her she could not rely on the numbers). Her claim that she was at Plan and "given no positive consideration" for such is thus unavailing. *See* Pl. 56.1 ¶ 170. The same error occurred on an MOU given to Kathy Miraglia, another LTCC. *See id.* ¶¶ 171–74; Def. Reply 56.1 ¶¶ 171–74.

document from today's call. Please read the document and sign at your earliest convenience. If you have any questions, feel free to contact me." *Id.* ¶ 53. Lyons responded, "I have no questions and will not be signing it." *Id.* ¶ 54.

On August 10, 2018, Crenshaw sent "Lorraine A. Lyons" an email stating, "Here's the MOU. We will set-up time with Brian [Seguin] to discuss more." Def. 56.1 ¶ 78; *see* Crenshaw Decl. ¶ 11. She attached an MOU dated August 3, 2018 with the subject "Final Warning." *See* Crenshaw Decl., Ex. B ("August MOU").[16]  The August MOU described the June MOU and stated:

> it was communicated that you were given until the July 28th [sic] to be at 119% of Secure Care prior year sales and 108% of Asset Flex prior year sales. As of July 31st, you were at 97% of Secure Care prior year sales and 98% of Asset Flex prior year sales. Accordingly, you are being provided with one final opportunity to meet your goals. The expectation is that you will be at 119% of prior year sales for Secure Care and 108% of Asset Flex by September 3rd, 2018.

*Id.* at 2; *see* Def. 56.1 ¶ 79; Pl. Counter 56.1 ¶ 79; Def. Reply 56.1 ¶ 79. Neither Seguin nor Crenshaw called, emailed, or texted to discuss the August MOU with Lyons. Pl. 56.1 ¶ 179.

At the end of September 2018, Lyons was at 92% of the previous year's LTCi sales and 99% of Asset Flex/Asset Preserver. *See* Def. Reply 56.1 ¶ 80; Seguin Reply Decl., Ex. A at 1. Her LTCi percentage was the second-lowest of all LTCCs. The only LTCC with a lower percentage was working in new territories, having taken on many of Crenshaw's territories after her January 2018 promotion. Def. 56.1 ¶ 81; Seguin Reply Decl. Ex. A at 16 (showing LTCC

---

[16] Lyons states that, in discovery, NYL produced a Final Warning dated August 10, 2018, Pl. 56.1 ¶ 183, and that the reason for having two Final Warnings has not been explained. *Id.* ¶¶ 182–85. This issue, however, is immaterial to the instant motion, as is Lyons's assertion that she never received the Final Warning. *See* Pl. Counter 56.1 ¶ 78; Pl. 56.1 ¶¶ 178, 187; Lyons Tr. at 394, 395 (stating "I have concerns about e-mails that were sent to the correct e-mail address . . . . I can't see the e-mail address that it was sent to" and noting a previous email "that had a name associated [with the email] that I did not use. So I question where e-mails came from and landed at" NYL).

Cole Vanassche at 91% in LTCi); *id.* Ex. B at 1 (showing that in 2017, Crenshaw was assigned

Austin, South Texas, Houston, San Antonio, Fort Worth, West Texas, Shreveport, and Dallas);

Seguin Decl. Ex. G at 1 (showing that in 2018, Vanassche was assigned, *inter alia*, South Texas,

Houston, Fort Worth, Shreveport, and Dallas).[17]

At the time of her termination, Lyons's pending but uncredited business was not assessed

as part of the evaluation as to whether she would make Plan. Pl. 56.1 ¶ 188. Lyons did not

ultimately meet Plan; although she ended the year at 106%, or 100% of Plan, for Asset Flex and

Asset Preserver, she only had 96%, or 80% of Plan, for LTCi. Def. 56.1 ¶ 62; Seguin Decl., Ex.

F.

*c.*    *Lyons's termination*

On October 1, 2018, Lyons was terminated at age 52. JSF ¶ 55; Pl. 56.1 ¶ 96. She was

the only LTCC terminated in 2018. Pl. 56.1 ¶ 96.[18] Five LTCCs under age 40 were employed

by NYL after Lyons was terminated. *Id.* ¶ 109. She was told that she was being let go for poor

performance. *Id.* ¶ 189. She was not told that her position was being eliminated. *Id.* ¶ 190.

Seguin testified that he, along with Human Resources and NYL's legal team, made the

decision to terminate Lyons because of her persistent failure to meet her sales goals. JSF ¶ 57;

Def. 56.1 ¶ 84; Seguin Tr. at 52, 55–56; *see id.* at 56 ("I believe we terminated because there was

a long period of missing the sales targets."). McGrath similarly so testified. *See* McGrath Decl.

¶¶ 10, 11 ("Although I did not make the termination decision, I concurred in the decision to

---

[17] Consistent with Seguin's practice not to issue LTCCs MOUs if they had spent less than one year working in a territory, Vanassche did not receive an MOU in 2018. Seguin Decl. ¶ 56; Pl. Counter 56.1 ¶ 21. Vanassche had previously worked at NYL as an internal wholesaler. Pl. 56.1 ¶ 94; Seguin Tr. at 28.

[18] Two other LTCCs were given MOUs and Final Warnings in 2018, and in March 2019, they were both let go by NYL. Pl. 56.1 ¶¶ 97–98. According to NYL, their jobs were eliminated. *Id.* ¶ 99.

terminate Ms. Lyons' employment."); Yee Decl., Ex. G ("McGrath Tr.") at 134–35 ("I was consulted on what the business decision was [with respect to Lyons's termination] and I agreed with the decision . . . typically when an employee has gone an MOU [sic], and an extension, and then a final, the next discussion would be, if they're not performing, that would be the decision that the business would need to determine."); *see also* Yee Decl., Ex. B ("Civello Tr.") at 64 (recalling that Seguin was reviewing Lyons's underperformance).  Lyons further testified that Seguin told her she was terminated because her "production had not improved that much."  JSF ¶ 56.

Upon termination, Lyons was offered a severance package that was similar to a job elimination package, because NYL would not be filling her position after she left.  Def. 56.1 ¶ 85.  Lyons's position was not filled after she left.  *Id.* ¶ 86.[19]

### 7.    Lyons's Allegations of Discrimination

Lyons casts the events above as evidencing age discrimination against her.  She points to the following as other evidence of such discrimination.

#### a.    Comments by Singer and Seguin

Lyons and her former coworker Steve Buell testified in depositions that, before 2018, they were privy to conversations with Singer "about getting rid of old New York Life people." Lyons Tr. at 187–88.  For instance, Lyons stated, "we were told by Ray Singer that they were going to get rid of the old New York Life people." *Id.* at 366.  Buell stated that Singer "would say . . . how him [sic] and Brian Seguin came to New York Life to remove, or to, as they put it, get rid of the older [LTCCs] and replace them with new people." Zappa Decl., Ex. 26 ("Buell

---

[19] Lyons represents that on an October 1—the year is not specified—Crenshaw sent an email about who would be covering Lyons's territories while a search for her replacement was underway.  Pl. Counter 56.1 ¶ 86.  She cites deposition excerpts to that end, but they are not in the record.  Accordingly, the Court cannot credit them.

Tr.") at 15–16. And Buell testified that Singer told him that he, Singer, was being let go because he had not been able to get rid of Buell; that Singer told him, in 2015 and at other points, that he had been hired to get rid of the old LTCCs; and that Singer had told him, in 2014, that Lyons was on a list of LTCCs to be gotten rid of. Pl. 56.1 ¶¶ 110–12, 114; *see* Buell Tr. Buell also testified that Singer had told Buell that, at some point, he had been in meetings where management personnel had asked HR how to get rid of certain people. Pl. 56.1 ¶ 117.

Lyons further testified that, in 2018, "[t]here were conversations with Brian [Seguin] . . . about getting rid of old New York Life people." Lyons Tr. at 187–88; *id.* at 188 (Lyons: "[Seguin] talked about us as being old New York Life people. I asked him specifically about his wanting to get rid of old New York Life people."); *id.* at 366. Lyons stated that on conference calls, Seguin "would refer to old New York Life people": "There were the old people and the young people," on "two teams." *Id.* at 189. Lyons testified that "clearly the divide was age" because "many of the younger ones were there as long or longer than some of the chronologically aged people." *Id.* Asked at her deposition whether Seguin had stated that NYL was "getting rid of all old people," or "discriminating against older people," or agreed "that older consultants were being treated unfairly or targeted," Lyons denied each. *Id.* at 201.[20] Lyons stated in her declaration that that she was told by Seguin and Singer that that younger LTCCs were given better territories and more earning opportunities because NYL wanted to retain those employees. Lyons Decl. ¶ 11. In her deposition, however, she testified that although between

---

[20] Eugene Kenny, another NYL employee, compared legacy NYL employees to employees who had worked at Genworth. He testified that NYL employees were receiving MOUs for failing to meet production goals, and he did not remember anyone from Genworth receiving such an MOU. Zappa Decl., Ex. 21 ("Kenny Tr.") at 30; *id.* at 31 ("they were looking the other way about their production standards for the Genworth folks and they were holding our feet to the fire on the production standards"); *see* Def. Reply 56.1 ¶ 127.

April 2015 and 2018, there were conversations about discrimination, she did not remember any specifics.  Lyons Tr. at 369; *id.* at 370 (Q: "Do you recall anything specific that you said to Brian about discrimination between those two times [sic] frames, anything?" A: "I do not at this moment.").

> b.      *Lack of coaching and support from Singer, Crenshaw, and Seguin*

Lyons identifies the following treatment of her by Singer, Crenshaw, and Seguin as evidence of age discrimination.

First, she notes that, between January 2014 and November 2015, she was not given a dedicated internal wholesaler, four of whom supported the 16 LTCCs, whereas she was given one after that.  Pl. 56.1 ¶¶ 128–29.

Second, Lyons states that Singer failed to adequately support her, in that he did not travel enough with her.  Lyons Tr. at 293.

Third, Lyons states that, in 2018, after she was placed on MOUs, Crenshaw and Seguin, in various ways, did not support her.  On March 11, 2018, Crenshaw emailed Lyons and told her they would have weekly calls to discuss her performance metrics.  Pl. 56.1 ¶ 143.  The extent to which Lyons and Crenshaw discussed her performance between then and Lyons's termination is not clear.  *See* Lyons Decl. ¶ 17 (calls never happened); Lyons Tr. at 143 (Lyons received "[v]ery little" coaching from Crenshaw); Crenshaw Tr. at 143 (describing communications with Lyons about performance metrics in 2018), 248 ("There was a point in the MOU process where I would reach out to her, give her updates, but she had decided that she wanted to work with [Seguin] going forward."); Seguin Tr. at 220–21 (noting an understanding that Crenshaw and Lyons would meet weekly or biweekly but not remembering whether they ever happened).  They spoke on the phone 10 times from March 19, 2018, and October 1, 2018.  Pl. 56.1 ¶ 145. Crenshaw, Seguin, and Lyons had one conference call after the March MOU.  *Id.* ¶ 146.  Lyons

states that "[t]he determined effort by Courtney Crenshaw to show me in a bad light was because I was being targeted on account of my age." *Id.* ¶ 154.

Finally, throughout, Lyons states that she had complained for years to Singer and then to Crenshaw that the dashboard showing her performance data was experiencing technical difficulties. *Id.* ¶ 118.

### B.    Procedural Background

On July 5, 2019, Lyons filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the New York State Division of Human Rights. JSF ¶ 58. On February 10, 2020, Lyons received a right to sue letter from the EEOC. *Id.* ¶ 60. On April 20, 2020, Lyons filed the complaint in this case. Dkt. 1; *see* Dkt. 5 (May 5, 2020 corrected filing). On August 5, 2020, NYL filed a partial motion to dismiss Lyons's New York law claims and a supporting memorandum of law. Dkts. 12–13. The same day, the Court ordered Lyons to file an amended complaint or oppose the motion to dismiss by August 26, 2020. Dkt. 14.

On August 20, 2020, Lyons filed her amended complaint. Dkt. 15. On September 10, 2020, NYL filed an answer. Dkt. 16. On November 20, 2020, the Court held an initial pretrial conference and issued a civil case management plan. *See* Dkts. 20, 24.

On August 16, 2021, after discovery, Lyons voluntarily dismissed with prejudice all claims based on sex discrimination, retaliation based on sex, and equal pay. *See* Dkt. 59. On August 31, 2021, the Court held a pre-motion conference. Dkt. 68.

On September 30, 2021, the parties filed their joint Rule 56.1 statement. Dkt. 71. On October 21, 2021, NYL filed its motion for summary judgment, Dkt. 72, a memorandum of law in support, Dkt. 73 ("Def. Mem."), Rule 56.1 statement, Dkt. 74, and the declarations of Jade

Yee, Brian Seguin, Courtney Crenshaw, and Beth McGrath in support of its motion, Dkts. 75–76, 78, 80.

On November 26, 2021, Lyons filed her opposition papers, Dkts. 90–143, which the Court directed her to refile, *see* Dkt. 149. On November 30, 2021, Lyons re-filed her memorandum of law in opposition to summary judgment, Dkt. 148 ("Pl. Opp'n"), her statement of additional material facts, Dkt. 157, her response to NYL's Rule 56.1 statement, Dkt. 160, and the declarations of Lyons, Steve Buell, and Armand Zappa in opposition, Dkts. 156, 158–59.

On December 8, 2021, NYL filed its reply memorandum of law, Dkt. 162 ("Reply"), reply to Lyons's response to NYL's Rule 56.1 statement, Dkt. 163, and the reply declarations of Jade Yee and Brian Seguin in support of NYL's motion for summary judgment, Dkts. 164–65.

## II.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (cleaned up). Only disputes over "facts that might affect the outcome of the suit under the governing law" will

preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (cleaned up); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010).

However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases[.]" *Weinstock v. Colum. Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski*, 596 F.3d at 101, and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted); *see also Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 21 (2d Cir. 2011) (summary order) ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations and 'set forth specific facts showing that there is a genuine issue for trial.'") (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 224 (2d Cir. 2006)). To survive a motion for summary judgment, therefore, a plaintiff must do more than merely create "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### III.    Discussion

Lyons brings claims of age discrimination, retaliation, and failure to promote under both the ADEA and the WLAD. The Court first addresses the extent to which Lyons's ADEA claims are time-barred, including her failure to promote claim. The Court then evaluates whether there is evidence to reach a jury on Lyons's timely ADEA claims of age discrimination and retaliation. Finding that summary judgment for the defense is warranted on all of Lyons's federal law claims, the Court considers whether to exercise supplemental jurisdiction over her state law claims.

#### A.    ADEA Claims

##### 1.    Timeliness

NYL argues that all ADEA claims based on conduct occurring before September 8, 2018—that is, 300 days before Lyons's July 5, 2019 EEOC charge—are time-barred. Def. Mem. at 7. Lyons counters that such claims are cognizable under the continuing violation doctrine. Pl. Opp'n at 16. NYL is correct.

###### a.    Applicable law

The ADEA requires a litigant to file an EEOC charge before initiating an age discrimination suit. 29 U.S.C. § 626(d). Where the state where the acts occurred is a "deferral state," as is Washington, a plaintiff may assert only claims alleged to have occurred within 300 days of filing a discrimination complaint with a state or local agency. *See id.*; *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328–29 (2d Cir. 1999) *Sanchez v. Pac. Powder Co.*, 147 F.3d 1097, 1099 (9th Cir. 1998). "Thus, only events that occurred during the 300-day period prior to filing" are actionable. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996); *see also Tewksbury*, 192 F.3d at 325; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–10 (2002).

There is an exception to this statute of limitations for continuing violations.  Under Title VII, "[w]hen a plaintiff experiences a continuous practice and policy of discrimination, the commencement of the statute of limitations may be delayed until the last discriminatory act in furtherance of it." *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (cleaned up).  The ADEA similarly enables a plaintiff to pursue untimely claims where she can establish a continuing violation. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).  It applies where there is "evidence of specific discriminatory practices, such as the repeated use of discriminatory seniority lists or employment tests," *id.* (citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993); *Cook v. Pan Am. World Airways*, 771 F.2d 635, 646 (2d Cir. 1985); *Assoc. Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 274–75 (2d Cir. 1981)), and "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice," *Cornwell*, 23 F.3d at 704.

However, that doctrine does not apply to—and recovery is unavailable for—"discrete acts of discrimination or retaliation that occur outside the statutory time period." *Morgan*, 536 U.S. at 105.  Acts of this nature include "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114.  The late Justice Ginsburg explained the rationale for not treating such acts as timely under the continuing violations doctrine:

> A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment.  And promotions, transfers, hirings, and firings are generally public events, known to co-workers.  When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext.

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 649 (2007) (Ginsburg, J., dissenting).  To constitute a continuing violation, such discrete incidents must be "specifically related and . . .

allowed to continue unremedied for 'so long as to amount to a discriminatory policy or practice.'" *Lightfoot*, 110 F.3d at 907 (quoting *Van Zant*, 80 F.3d at 713).

> b.    *Analysis*

NYL seeks to preclude all ADEA claims based on conduct before September 8, 2018. Def. Mem. at 7. Lyons, while attaching few specifics to these claims, urges that all are properly pursued. She argues that all NYL actions towards her before the start of the limitations period "are ripe for decision," because "the individual discrete age discriminatory acts . . . were all a part of [NYL's] continuing operation to terminate the Longer Employed LTCCs, and more specifically Lyons," and part of "a common scheme that was at all times being perpetrated by, or under the direct supervision of, Brian Seguin." Pl. Opp'n at 16.

The conduct predating September 8, 2018, includes virtually all acts on which Lyons relies preceding her termination 23 days later, on October 1, 2018. These acts are:

- The April 2015 MOU Lyons received from Singer, Def. 56.1 ¶ 23;

- The September 2015 MOU Lyons received from Singer, *id.* ¶ 26;

- The denial to Lyons of a dedicated internal wholesaler from January 2014 to November 2015, Pl. 56.1 ¶¶ 128–29;

- The December 2015 "Final Warning" Lyons received from Singer, Def. 56.1 ¶ 29;

- Singer's failure to travel with Lyons as he did other LTCCs, *see* Pl. 56.1 ¶ 141; Lyons Tr. at 293;

- The January 2018 promotion of Crenshaw, JSF ¶¶ 42–45;

- The reassignment of general offices and territories in January 2018, *id.* ¶ 46;

- The March MOU, first issued on March 13, 2018, *id.* ¶ 49; Def. 56.1 ¶¶ 68, 70;

- The April MOU, issued on April 2, 2018, JSF ¶ 49; Def. 56.1 ¶¶ 68–70;

23

- The June MOU, issued on June 13, 2018 and sent on June 26, 2018, JSF ¶ 50; Def.
  56.1 ¶ 75; Seguin Decl. ¶ 53;

- The August MOU, issued on August 3, 2018 and sent on August 10, 2018, Def. 56.1
  ¶ 78; *see* Crenshaw Decl. ¶ 11, *id.* Ex. B; and

- The alleged lack of support by Crenshaw and Seguin after having been placed on an
  MOU between March 11, 2018 and September 8, 2018, *see* Pl. 56.1 ¶¶ 143, 145.

At the outset, even assuming that these were the product of a discriminatory policy or practice, all of the MOUs and the Final Warning, being negative performance reviews, qualify as quintessential discrete acts. They cannot form part of a continuing violation.

The same is so of the promotion of Crenshaw and reassignment of general offices. As to each of these acts, Lyons necessarily knew of the act when it occurred. Each time, Lyons could therefore "immediately seek out an explanation and evaluate it for pretext." *Ledbetter*, 550 U.S. at 649 (Ginsburg, J., dissenting). Acts of this nature cannot be the basis for finding a continuing violation. *See, e.g., Hadid v. City of New York*, 730 F. App'x 68, 72–73 (2d Cir. 2018) (summary order) (district court "did not err in identifying Hadid's reassignment and internal discipline as discrete acts to which the continuing violation doctrine could not apply"); *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 366 (S.D.N.Y. 2008) ("Each negative performance evaluation is a discrete act.") (citing *Ledbetter*, 550 U.S. at 638–39 and *O'Dwyer v. Snow*, No. 00 Civ. 8918 (LTS) (FM), 2004 WL 444534, at *6 (S.D.N.Y. Mar. 10, 2004)); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012) ("[E]very failure to promote is a discrete act that potentially gives rise to a freestanding Title VII claim with its own filing deadline.").

As to Lyons's claim that she was denied an internal wholesaler, that too was a discrete act. In any event, no part of that claim took place, or was related to any discriminatory practice during, the statutory limitations period. Rather, on the undisputed facts, it was remediated in November 2015, nearly three years before the commencement of the limitations period, when Lyons claims that she was given a dedicated internal wholesaler. Accordingly, no claims arising from such a denial may be brought. *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) ("To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period."); *Little v. Nat'l Broad Co.*, 210 F. Supp. 2d 330, 367 (S.D.N.Y. 2002 ("[T]here is no 'continuing violation' where such a significant gap of time exists between time-barred acts of alleged discrimination and timely allegations.") (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998); *Annis v. Cnty. of Westchester*, 36 F.3d 239, 251 (2d Cir. 1994)).

Lyons also asserts, generally, that, at points, Singer, Crenshaw, and Seguin did not adequately support her in her job. That grievance is not an available basis on which to find a continuing violation because Lyons has not mustered evidence tying it to discrimination. A continuing violation necessarily entails an "ongoing *discriminatory* policy or practice." *Van Zant*, 80 F.3d at 713 (emphasis added). Here, nothing besides Lyons's say-so ties her asserted lack of workplace support to age discrimination. Although an assertion to this effect "may be sufficient to withstand a challenge for failure to state a claim, something more is needed to defeat summary judgment" via a finding of a continuing violation. *See Crosland v. City of New York*, 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2001) (citation omitted). Nothing more exists here. A good illustration is Lyons's claim in her declaration that "Ray Singer traveled with the younger (under

40) LTCCs more times than he did me." Lyons Decl. ¶ 14.  Lyons does not cite any record support for this claim.[21]  Likewise she cites nothing to link the ostensibly unsatisfactory number of phone calls or meetings that Crenshaw and Seguin had with her to her age.  She states only, conclusorily, that Crenshaw made a "determined effort . . . to show [Lyons] in a bad light . . . because [she] was being targeted on account of [her] age."  *Id.* ¶ 24.  Such conjecture does not give rise to an inference of discrimination.  *See Fisher v. Vassar Coll.*, 70 F.3d 1420, 1439 (2d Cir. 1995) (plaintiff's "'sense of being discriminated against' is not evidence"), *on reh'g en banc*, 114 F.3d 1332 (2d Cir. 1997); *Holcomb*, 521 F.3d at 137 ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").  Indeed, even Lyons, at points, offers contrary conjecture.  She accounts for the lack of support she perceived as bespeaking not age discrimination, but a "continuing operation to terminate the Longer Employed LTCCs"—that is, aimed at employees based on their seniority at NYL, not their ages.  Pl. Opp'n at 16.

Accordingly, the Court finds time-barred Lyons's federal law (ADEA) claims to the extent these are based on conduct before September 8, 2018.

### 2.    Failure to Promote

NYL moves for summary judgment on Lyons's failure to promote claim under the ADEA because (1) it is time-barred and (2) fails on the merits.  Def. Mem. at 19 & n.13.  Lyons argues that when Crenshaw was promoted to Regional Manager, she was discriminated against.  *See* Pl. Opp'n at 17–19.  That claim is time barred.  As the Second Circuit has explained: "*Morgan* established that an employer's failure to promote is by its very nature a discrete act."

---

[21] Similarly, while testifying that Singer "wasn't traveling with me as he was with others" and "I did not have the same support as my peers," Lyons Tr. at 293–94, Lyons did not point to any basis to find the relative lack of attention paid to her to result from discrimination.

*Chin*, 685 F.3d at 157; *see Morgan*, 536 U.S. at 115.  Accordingly, such claims must be brought within 300 days of the conduct at issue.  Crenshaw was promoted in January 2018, but Lyons did not file her EEOC charge until July 5, 2019—a year and a half later.  As such, her challenge to the promotion decision is untimely.  *See, e.g., Staten v. City of New York*, 726 F. App'x 40, 43 (2d Cir. 2018) (summary order) (barring plaintiff from pursuing untimely ADEA failure to promote claims); *Alleva v. N.Y.C. Dep't of Invest.*, 696 F. Supp. 2d 273, 282 (E.D.N.Y. 2010), *aff'd*, 413 F. App'x 361 (2d Cir. 2011) (summary order) (same); *Idrees v. City of N.Y. Dep't of Parks & Recreation*, No. 04 Civ. 2197 (LAK) (GWG), 2005 WL 1026027, at *5 (S.D.N.Y. May 3, 2005) (failure to promote claims untimely where they "fall outside the statutory time period for filing a charge with the EEOC").  The Court grants NYL summary judgment on Lyons's ADEA failure-to-promote claims.

### 3.    Discrimination

NYL moves for summary judgment on Lyons's age discrimination claim, arguing that the evidence does not make out a *prima facie* case and that, even if it did, NYL had legitimate, non-discriminatory reasons for Lyons's MOUs and termination as to which there is no genuine issue of material fact.  Def. Mem. at 9, 13.  Lyons counters by stating that there is direct evidence of age discrimination, Pl. Opp'n at 3, circumstantial evidence supporting an inference of such discrimination, *id.* at 6, and evidence that NYL's stated basis for terminating Lyons was pretextual, *id.* at 12.  Again, NYL is correct.

### a.    Applicable law

Under the ADEA, it is unlawful "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a).  In analyzing a claim of age discrimination under the ADEA, courts in this Circuit employ the burden-shifting framework

articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gorzynski*, 596 F.3d at 106.

Under that framework, a plaintiff "bears the initial burden of establishing a prima facie case of discrimination." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). "If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Defendants' burden, however, is "one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000). "Once such a reason is provided, the plaintiff can no longer rely on the *prima facie* case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Gorzynski*, 596 F.3d at 106.

As the Supreme Court held in *Gross v. FBL Financial Services, Inc.*, "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." 557 U.S. 167, 180 (2009). Accordingly, age cannot have been "just a contributing or motivating factor," but must indeed have been the "but-for cause." *Gorzynski*, 596 F.3d at 106; *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.2 (2d Cir. 2009).[22]

---

[22] Lyons incorrectly argues that, if she were to adduce direct evidence of age discrimination, such would "obviate[] the use of the framework set forth in *McDonnell Douglas*" and spare her the obligation of establishing that age discrimination had been a but-for cause of her termination. Pl. Opp'n at 3. Lyons relies on inapposite precedents, including those under Title VII and New York state and local law. *See id.* (citing *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20 Civ. 4558 (JMF), 2021 WL 5179914 (S.D.N.Y. Nov. 8, 2021) (New York state and local law claims); *Palencar v. N.Y. Power Auth.*, 834 F. App'x 647, 649 (2d Cir. 2020) (summary order) (Title VII and New York law claims); *Olaechea v. City of N.Y.*, No. 17 Civ. 4797 (RA), 2019 WL 4805846 (S.D.N.Y. Sept. 30, 2019) (same); *Cameron v. N.Y.C. Dep't of Educ.*, No. 15 Civ. 9900 (KMW), 2018 WL 1027710 (S.D.N.Y. Feb. 21, 2018) (New York local law claims); *see also, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (allowing Title VII plaintiffs proffering direct evidence of discrimination to "prevail if the evidence, viewed in the light most favorable to the plaintiff, would permit a jury to find that her dismissal was motivated *at least in part* by age

b.    Prima facie *case*

To establish a *prima facie* case of age discrimination under *McDonnell Douglas*, Lyons

must demonstrate that: (1) she was within the protected group of employees (those over age 40);

(2) she was qualified for the position in question; (3) she experienced an adverse employment

action; and (4) that action occurred under circumstances giving rise to an inference of

discrimination. *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012)

(citing *Gorzynski*, 596 F.3d at 107); *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 504

(S.D.N.Y. 2012), *aff'd*, 766 F.3d 163 (2d Cir. 2014).

Here, the only adverse action that occurred within the limitations period was Lyons's

termination, on October 1, 2018.[23]  The other timely action Lyons contends was adverse to her

after September 8, 2018 was Crenshaw and Seguin's lack of support for her after MOUs were

issued; the two, Lyons argues, did "not follow[] up on giving [her] the assistance that was

promised." *See* Pl. Opp'n at 5.  But even construing the facts in the light most favorable to

_____

discrimination"); *see also Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762, 768 (S.D.N.Y. 2002) ("In a
mixed-motive case, the term 'direct evidence' is used to distinguish direct evidence from the
kind of evidence which makes out a *McDonnell Douglas prima facie* case—*i.e.*, evidence from
which an inference of discrimination arises only because it eliminates the most common
nondiscriminatory reasons for the plaintiff's rejection, and which inference is therefore
immediately dispelled once the employer has produced evidence of a nondiscriminatory
reason.") (internal quotation marks omitted) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450
U.S. 248 (1981); *Weinstock*, 224 F.3d at 42; *Cartagena v. Ogden Servs. Corp.*, 995 F. Supp. 459,
462 (S.D.N.Y. 1998)).

But Lyons's argument is squarely foreclosed by *Gross*, *supra*, which pointedly did not extend
this doctrine to the ADEA.  *See Gorzynski*, 596 F.3d at 106 (recognizing that *Gross* "eliminat[ed]
the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases.")
(citing *Gross*, 557 U.S. at 174–75).  Instead, as noted above, an ADEA plaintiff must prove, by a
preponderance, that "age was the 'but-for' cause of the challenged employer decision." *Gross*,
557 U.S. at 177–78; *see Gorzynski*, 596 F.3d at 106.

[23] Lyons identifies other putative adverse actions, but these predate September 8, 2018.  *See* Pl.
Opp'n at 5.

Lyons, the lack of coaching or mentoring aid during this window does not rise to the level of an adverse action. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997). To so qualify, an action must work a "materially adverse change in the terms and conditions of employment, . . . more disruptive than a mere inconvenience or alteration of job responsibilities." *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 213 (E.D.N.Y. 2014) (citing *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)) (internal quotation marks omitted). And "not everything that makes an employee unhappy is an actionable adverse action." *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) (citation omitted). Here, Lyons has not identified "material harm" or change to her employment conditions flowing from the lack of phone calls or other support. Accordingly, while the termination that came soon thereafter is cognizable—indeed, the quintessential adverse action— the lack of workplace assistance to Lyons in the weeks beforehand is not. *See Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013).

As to Lyons's termination, the defense does not dispute the first three elements of the *prima facie* case. It disputes only the fourth: whether Lyons was discharged under circumstances that give rise to an inference of discrimination based on age. As to that element, in the interests of economy, the Court assumes *arguendo* that the evidence on which Lyons relies—consisting of workplace comments about older employees and the pattern of discharges—clears the low bar required for a *prima facie* case of age discrimination, and proceeds to the ensuing steps of the *McDonnell Douglas* analysis.[24]

---

[24] Given the relative ease of meeting a *prima facie* burden, courts in this District often assume such *arguendo* and proceed to the subsequent *McDonnell Douglas* steps. *See, e.g., Yagudaev v. Credit Agricole Am. Servs., Inc.*, No. 18 Civ. 513 (PAE), 2020 WL 583929, at *10 (S.D.N.Y. Feb. 5, 2020) (assuming without deciding *prima facie* case where parties disputed fourth element); *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 718 (S.D.N.Y. 2018)

c.    *Legitimate nondiscriminatory reasons*

NYL has plainly articulated a "legitimate, nondiscriminatory reason" for Lyons's

termination—namely, her "poor performance, including her failure to meet production goals."

Def. Mem. at 13 (citing *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 573 (S.D.N.Y.

2010); *Varno v. Canfield*, 664 F. App'x 63, 65 (2d Cir. 2016) (summary order)).  NYL supports

its claim with substantial contemporaneous documentary evidence.

As explained above, between Lyons's hire in 2014 to her termination in 2018, she had

numerous periods of substandard performance and was repeatedly cited or disciplined for the

same.  She finished 2014 at 43% of Plan in one metric and 38% in another.  Def. 56.1 ¶ 20.  In

2015, Lyons received escalating MOUs—she received an MOU in April 2015 because of

underperformance, *id.* ¶ 23; she received another in September 2015, *id.* ¶ 26; and she received a

Final Warning in December 2015, *id.* ¶ 29.  She ultimately met her goals and was not terminated

then.  *Id.* ¶¶ 32–33; Pl. Counter 56.1 ¶ 32.  After a couple of years without incident—including

2016, when she did not receive any negative documentation, and 2017, when, per a general

policy, no LTCCs were given MOUs—her performance in 2018 deteriorated, and at a time when

NYL had reinforced its performance expectations.  *See* JSF ¶¶ 31, 34–36, 48–50.  That year, her

production was consistently below the goals NYL had set, and she received several MOUs,

beginning in March 2018, based on her 2017 and early 2018 performance.  *Id.* ¶¶ 48–49; Def.

---

(assuming *prima facie* case of employment discrimination); *Stuart v. T-Mobile USA, Inc.*, No. 14
Civ. 4252 (JMF), 2015 WL 4760184, at *9 (S.D.N.Y. Aug. 12, 2015) (assuming *prima facie* case
of disability discrimination); *Suares v. Cityscape Tours, Inc.*, No. 11 Civ. 5650 (AJN), 2014 WL
969661, at *11 (S.D.N.Y. Mar. 12, 2014), *aff'd*, 603 F. App'x 16 (2d Cir. 2015) (summary order)
(assuming *prima facie* case of retaliation); *Joseph v. Marco Polo Network, Inc.*, No. 09 Civ.
1597 (DLC), 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010); *see also, e.g., Slattery v.
Swiss Reins. Am. Corp.*, 248 F.3d 87, 93 (2d Cir. 2001) (noting that "one may well doubt that a
*prima facie* case exists" but "[a]ssuming *arguendo* that it does"), *as amended* (June 6, 2001).

56.1 ¶¶ 61, 68, 70.  The 2018 MOUs escalated in April, May, June, and August before she was
terminated in October 2018.

Accordingly, because "[p]oor performance . . . is the *ne plus ultra* of legitimate, non-
discriminatory business rationales," *Downey v. Adloox, Inc.*, No. 16 Civ. 1689 (JMF), 2018 WL
5266875, at *5 (S.D.N.Y. Oct. 23, 2018) (citing *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87,
93 (2d Cir. 2001), *as amended* (June 6, 2001)), *aff'd*, 789 F. App'x 903 (2d Cir. 2019) (summary
order), NYL has clearly met its burden here.

<blockquote><em>d.        But-for causation</em></blockquote>

To survive summary judgment, Lyons must come forward with admissible evidence
"upon which a reasonable jury could conclude by a preponderance of the evidence that her age
was a 'but for' cause of [NYL's] decision to fire her." *Gorzynski*, 596 F.3d at 107; *see Gross*,
557 U.S. at 180.  She must thus show that the performance-based reason NYL has stated for
terminating her was pretextual.

Such a showing is challenging here.  NYL has adduced substantial documentary evidence
both of Lyons's substandard and deteriorating performance, and of its decision to terminate
her—after previously having kept her on despite her faltering performance—consistent with its
decision to hold LTCCs strictly to their performance goals.  In attempting this showing, Lyons
relies on NYL's statement to the EEOC about why Lyons was terminated and "all of the acts"
she recites in her memorandum of law.  These include "giving [Lyons] more General Offices to
cover, over a larger geographic area than any LTCC, to repeatedly giving [Lyons] inaccurate
MOUs in 2018 . . . [and] "the decision to give a younger LTCC higher opportunity California
General Offices than were given to [Lyons]." Pl. Opp'n at 12–13.

This evidence, viewed singly and together, is insufficient, however, to support a finding either that NYL's stated basis for terminating Lyons was pretextual, or that her age was the but-for cause of her termination.

i.       NYL's statement to the EEOC

Lyons argues that NYL's letter to the EEOC accounting for her termination would give a jury a basis to infer that age discrimination was the but-for cause of that termination. She paints NYL's statement as indicating solely that her job was being eliminated, and thus as inconsistent with NYL's explanation to her that her performance had been deficient. She states that she "was told that she was being let go for poor performance, [but] she was never told, at or before her termination, that her job was being eliminated." *Id.* at 11. On the premise that NYL gave "a false reason" to a government agency, Lyons argues, "a reasonable jury could infer age discrimination" from this falsehood, and find that NYL's "proffered reason is mere pretext." *Id.* at 11–12.

Lyons's argument fails because its premise—that NYL made inconsistent statements as to her and to the EEOC—is wrong. Contrary to Lyons's portrait, NYL explicitly told the EEOC that Lyons's termination was a result of bad performance. The letter stated: "The job elimination was based on her poor performance." Yee Decl., Ex. J at 2. Whether or not the NYL decided to fill the vacancy created by Lyons's discharge does not in any way impeach its statement attributing her discharge to poor performance. And Lyons's unawareness that her position would thereafter not be filled does not, at all, indicate that her age played her role in the decision to terminate her.

There are situations where an employer's changed explanation for an adverse employment action may evidence pretext. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846–47 (2d Cir. 2013) (where company told EEOC there had been a change in its business focus

necessitating terminations and said nothing about performance, but testimony contradicted that statement, a reasonable juror could infer pretext).  But not so here, because NYL's statements on the subject were consistent.  *See Hess v. Mid Hudson Valley Staffco LLC*, No. 16 Civ. 1166 (KMK), 2018 WL 4168976, at *17 (S.D.N.Y. Aug. 30, 2018) (where arguments to EEOC were "entirely consistent with Defendant's argument in this Action," pretext could not be shown), *aff'd*, 776 F. App'x 36 (2d Cir. 2019) (summary order); *cf. McEvoy v. Fairfield Univ.*, 844 F. App'x 420, 421–22 (2d Cir. 2021) (summary order) (finding unavailing plaintiff's argument that defendant's explanations had been "'shifting' and 'inconsistent' with its response to" a state agency, as "any inconsistencies pointed out by McEvoy are too immaterial to constitute evidence of pretext here").

ii.     Claims of disadvantage

Lyons next argues that her age can be found to be the but-for cause of her termination because she was disadvantaged by the territories she was assigned to cover.  For several reasons, that conclusion does not follow.

First, Lyons's performance troubles preceded the 2018 territory re-assignments.  Her documented under-performance began in 2014, continued into 2015, and then re-emerged in 2017 and 2018.  The evidence does not support that her territory assignments precipitated the poor performance that induced her termination.

Second, the undisputed evidence is not consistent with Lyons's claim to have received unfavorable—or unwanted—territory assignments.  Although Lyons testified in this litigation that she did not want the territory of Alaska, Lyons Tr. at 375; Pl. 56.1 ¶ 135, the undisputed evidence reflects that she initially sought out that territory and expressed confidence to Crenshaw that she could "drive Alaska," Def. 56.1 ¶ 52; Crenshaw Decl., Ex. A.  Most LTCCs were given two "Tier 1" offices; so was Lyons.  Def. 56.1 ¶ 57.

Third and most important, even if there were evidence that Lyons's assignments were (1) unfavorable and (2) intentionally allotted to disadvantage her, she has not mustered any evidence that these assignments were made on account of her age. Lyons's premise appears to be that the assignment of a larger number of offices to cover would disadvantage an LTCC, notwithstanding that it would give her a heightened opportunity to achieve performance metrics. Even accepting this dubious premise, the data do not bear out that Lyons's assignments were materially higher than the norm. Lyons and one other LTCC covered 10 general offices, Pl. 56.1 ¶ 136, but as Lyons admits, the territory assignments of "a young LTCC," Roger Braxton, are inconsistent with the premise that the number and dispersal of general offices assigned to her exceed that of others. Pl. Opp'n at 12 n.7. Nor do the data show a clear correlation between an LTCC's age and the volume of territorial assignments. Three LTCCs younger than Lyons were assigned territories with less tonnage; two LTCCs older than Lyons were assigned territories with more tonnage. Def. 56.1 ¶¶ 55–56. One LTCC older than Lyons had more Tier 1 offices than she did; three LTCCs younger than Lyons had fewer such offices. *Id.* ¶¶ 58–59. Comparing the 2018 office assignments of LTCCs around the same age underscores the point. For example, Braxton, who was 27 in 2018, *see* Zappa Decl., Ex. 1, was assigned 10 general offices, of which four were Tier 4, three were Tier 3, and three were Tier 2. *See* Seguin Decl., Exs. G, I. Matthew Pisera, who was also 27 in 2018, *see id.*, Ex. E, was assigned eight general offices, of which five were Tier 4, one was Tier 2, and two were Tier 1. *See id.*, Exs. G, I. Steve Buell, who was the same age as Lyons, *see id.*, Ex. E, had six general offices, all concentrated in Southern California including one Tier 4, one Tier 3, two Tier 2, and two Tier 1 offices. *See id.*, Exs. G, I. These data do not show that age drove either the number or quality of territory assignments.

35

In all events, to the extent Lyons posits that age discrimination can be inferred from the splay of territory assignments among NYL's LTCCs, she has failed to come forward with evidence of comparators sufficient to substantiate that claim. She does not point to any evidence that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *See Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks omitted). Indeed, Lyons has not concretely identified any younger LTCC who was assigned to cover smaller territories or fewer general offices, achieved similar performance metrics, and who was treated differently than she. *See Hess*, 2018 WL 4168976, at *18 (citing *Bucek v. Gallagher Bassett Servs., Inc.*, No. 16 Civ. 1344 (KMK), 2018 WL 1609334, at *14 (S.D.N.Y. Mar. 29, 2018); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 514 (S.D.N.Y. 2010) ("[V]ague claims of differential treatment alone do not suggest discrimination, unless those treated differently are similarly situated in all material respects.") (internal quotation marks omitted)). Accordingly, Lyons's bid to show pretext based on ostensible comparators and statistical patterns fails, for want of satisfactory analytic rigor. *See, e.g., Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 256 (S.D.N.Y. 2015) (citing *Rivera v. Orange Cnty.*, No. 10 Civ. 9134 (VB), 2013 WL 812016, at *7 (S.D.N.Y. Mar. 5, 2013), *appeal dismissed* (Aug. 28, 2013)).

Finally, to the extent Lyons's claim is, implicitly, that she was set up to fail by virtue of receiving challenging assignments that made poor performance and termination more likely, that assertion is speculative. She has not supported it with any testimony or documentary evidence. And the premise that a plot to trip her up was animated by her age is doubly speculative. Such conjecture cannot sustain a claim otherwise insufficient to clear summary judgment. *See Brenner v. City of New York Dep't of Educ.*, 132 F. Supp. 3d 407, 419 (E.D.N.Y. 2015) ("[T]he

vast majority of plaintiff's purported evidence that he was . . . set up to fail amounts to nothing more than conclusions[.]"), *aff'd*, 659 F. App'x 52 (2d Cir. 2016) (summary order); *Trane v. Northrop Grumman Corp.*, 94 F. Supp. 3d 367, 379 (E.D.N.Y. 2015) (plaintiff's "unsubstantiated assertion that Defendant set him up to fail by transferring him to a new group and giving him an unreasonable amount of work after his disability" cannot defeat summary judgment), *aff'd*, 639 F. App'x 50 (2d Cir. 2016) (summary order).

### iii.    Inaccurate MOUs

Next, Lyons claims that the MOUs issued to her, which led to her termination, were based on factual miscalculations about her performance. Without more, this does not show that NYL's stated performance reasons for terminating her were pretexts for age discrimination.

"The mere fact that an employee disagrees with her employer's assessments of her work cannot standing on its own show that her employer's asserted reason was pretextual." *Parron v. Herbert*, No. 17 Civ. 3848 (GBD), 2018 WL 2538221, at *6 (S.D.N.Y. May 18, 2018) (quoting *Cappelli v. Jack Resnick & Sons, Inc.*, No. 13 Civ. 3481 (GHW), 2016 WL 958642, at *8 (S.D.N.Y. Mar. 8, 2016)) (cleaned up), *aff'd*, 768 F. App'x 75 (2d Cir. 2019) (summary order). Accordingly, Lyons's beef with NYL's calculation of her metrics—she faults it for not taking into account future work and for its use of percentages of annual Plan targets to gauge performance—is insufficient to show pretext. That is because a "clear and specific" explanation that is "honest even though partially subjective" does not rise to the level of pretext. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (internal quotation marks omitted).

Here, NYL set out and explained the relevant metrics, including in the MOUs which recounted Lyons's performance deficits. *See* Def. 56.1 ¶¶ 71–72 (April MOU described metrics as percentages of the previous year's sales and stated expectations); 76 (June MOU noted that

sales for LTCi were below Plan); August MOU at 2 (describing expectations, failure to meet them, and giving opportunity to do so based on percentage of prior year's sales). NYL was entitled to calculate her metrics as it saw fit, and repeatedly communicated to her the salient data and expectations. And Lyons does not argue that these metrics uniformly applied to her or to older LTCCs or were adopted in an attempt to hobble older workers. Lyons's critique of NYL's metrics, therefore, does not support her claim of pretext.

iv.    Other bases for claiming discrimination

Lyons recites a potpourri of other bases to claim age discrimination. None shows that she would not have been terminated but for her age. Although not directly raised in her discussion of pretext, the Court addresses them briefly here.[25]

*Age vs. seniority*: First, she notes that several "Longer Employed" LTCCs left between February 10, 2014 and March 2019. This, she argues, viewed alongside her termination, "evidenced a demonstrable pattern of reducing the age of the LTCC workforce," Pl. Opp'n at 6. But, as NYL rightly notes, Lyons's factual claims about the circumstances of others' purported departures, tenure, and ages, are not cognizable, because they are not based on Lyons's personal knowledge and they are not grounded in the record. Def. Reply 56.1 ¶¶ 95, 100–01.

In any event, Lyons's equation of longer-tenured LTCCs with older LTCCs is empirically faulty. *See* Pl. 56.1 ¶ 95. Throughout her opposition to the motion for summary

---

[25] Lyons also makes claims about conduct that this Court has found untimely under the ADEA. These include a 2015 MOU from Singer; the denial of a dedicated internal wholesaler to support her in her work, which she argues made her less productive; Singer's refusal to cancel an MOU or contest what Lyons had written on it; Lyons's not being "singled out for praise" after a positive performance; a general lack of support from Singer; and the 2018 MOUs. Pl. Opp'n at 7–11. Although acts predating the limitations period may be considered as "relevant 'background evidence in support of [her] timely claim,'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) (quoting *Morgan*, 536 U.S. at 133), none of those here demonstrate age discrimination, other than via Lyons's conclusory interpretations. *See Meiri*, 759 F.2d at 998.

38

judgment, she describes actions taken by NYL against "existing LTCCs," or "Longer Employed LTCCs," eliding a crucial distinction between age and seniority. *See, e.g.*, Pl. Opp'n at 3, 4, 6, 7, 13, 16. Seniority, however, is not a protected class. And as the Supreme Court has recognized, "an employee's age is analytically distinct from his years of service." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993); *see Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005). "Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Hazen Paper Co.*, 507 U.S. at 611. Tellingly, Lyons elides this distinction in reciting evidence ostensibly indicative of age bias. For example, Lyons testified that, in 2018, "[t]here were conversations with [Seguin] . . . about getting rid of old New York Life people." Lyons Tr. at 187–88; *id.* at 188 (Lyons: "[Seguin] talked about us as being old New York Life people. I asked him specifically about his wanting to get rid of old New York Life people."); *id.* at 366. Lyons similarly testified that on conference calls, Seguin "would refer to old New York Life people": "There were the old people and the young people," on "two teams." *Id.* at 189. Lyons opined in her deposition that "clearly the divide was age" because "many of the younger ones were there as long or longer than some of the chronologically aged people." *Id.* But when asked whether Seguin had ever said that NYL was "getting rid of all old people" or agreed that older consultants were being unfairly targeted, Lyons answered no to both. *Id.* at 201. The assembled record thus does not leave any reliable, non-conclusory evidence of age discrimination by NYL, let alone that such brought about Lyons's discharge.

In a similar vein, Lyons's declaration stated that she was told by Seguin and Singer that younger LTCCs were given better territories and more earning opportunities because NYL wanted to retain those employees. Lyons Decl. ¶ 11. Pressed, however, Lyons testified that

although between April 2015 and 2018, there were conversations about discrimination, she did not remember any specifics. Lyons Tr. at 369; *id.* at 370 (Q: "Do you recall anything specific that you said to Brian about discrimination between those two times [sic] frames, anything?" A: "I do not at this moment."). Lyons's generic attribution of age discriminatory motives to her superiors at NYL, shorn of specifics, prevents her recollections from giving rise to a genuine issue of material fact as to whether NYL treated—or whether its executives admitted having treated—younger employees better as a general practice, much less whether age was the but-for cause of her termination. *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

**Statements by executives**:  Second, Lyons cites a smattering of statements as ostensible admissions of an intention to discriminate based on age. These include that Singer told Buell that he and Seguin "had been hired to get rid of the Longer Employed LTCCs," Pl. Opp'n at 6, that Singer referred to Lyons as "cancer," which Lyons opines revealed that "Seguin told . . . Singer to put pressure on Lyons," *id.* at 7, and that Crenshaw gave a young LTCC better general offices because he was a "stud," *id.* at 8. NYL challenges these statements, to the extent they reflect secondhand accounts by one NYL employee of another's words, are hearsay. Lyons defends these statements as admissible under Fed. R. Evid. 801, presumably on the ground that such statements may be received for purposes other than the truth of the matter asserted, but she does not explain why such is so.

In all events, these stray, uncorroborated remarks do not demonstrate age discrimination generally, or that such discrimination afflicted Lyons specifically. Rather, the Second Circuit has directed courts presented with such remarks to assess:

(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at

40

issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *see also Tomassi v. Insignia Fin. Grp. Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark," and "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be") (collecting cases).

Measured against that standard, the remarks Lyons cites here are not probative that the long-documented performance deficiencies that NYL cited in terminating her were pretextual. Importantly, for example, all the comments attributed to Singer were made months, if not years, before her termination. And Singer was not the decisionmaker for Lyons's termination—he had by then left NYL—and the remarks were not made in the context of decision-making as to Lyons's termination. *See Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks . . . by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote [from] the date of the decision.") (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)). And his remark calling her a "cancer," while clearly malicious, fails to clearly "evince[] a discriminatory state of mind." *See Tomassi*, 478 F.3d at 115. For much the same reason, Singer's comment about "Longer Employed LTCCs" bears little, if at all, on the reasons behind Lyons's later termination.

Similarly, the statement attributed to Crenshaw about a younger LTCC getting better territories because he was a "stud" does not meaningfully speak to whether NYL's explanation for terminating Lyons was genuine or pretextual.[26]  Crenshaw did not make the decision to terminate Lyons, and her comment does not reference, let alone clearly evince age discrimination as to, Lyons.  The statement is also unmoored in time, undermining its probative value.  *See Yagudaev*, 2020 WL 583929, at *12 ("Yagudaev's inability to situate these statements in time further weakens his argument that they raise a triable issue of pretext."); *Huminski v. Stop & Shop Supermarket Co.*, No. 16 Civ. 1136, 2019 WL 4804913, at *4 (D. Conn. Sept. 30, 2019) (that "record is silent as to the timing of the . . . remark" was "factor[] weigh[ing] against plaintiff").[27]

---

[26] NYL disputes that this and some of the other statements at issue were made.  On NYL's motion, however, the Court views all facts in light of the non-movant, and therefore credits *arguendo* that that such statements were made.

[27] The comments cited by Lyons fall well short of those in numerous cases where stray remarks, including those made by a decisionmaker, were held insufficient to establish discrimination.  *See Hess v. Mid Hudson Valley Staffco LLC*, 776 F. App'x 36, 37 (2d Cir. 2019) (summary order) (affirming grant of summary judgment to ADEA defendant where plaintiff adduced evidence that her manager and the manager's supervisor made repeated comments suggesting plaintiff was too old to continue working, but failed to establish other indicia of discriminatory animus); *Fletcher v. ABM Building Value*, 775 F. App'x 8, 13 (2d Cir. 2019) (summary order) (affirming grant of summary judgment to Title VII defendants despite plaintiff's sworn statement that her direct supervisor and two other supervisors called her "bitch" and "black bitch," and referred to her as "bubble girl"); *Slattery*, 248 F.3d at 92–94 (executive's statement that he intended to make the image of the company younger—made shortly before plaintiff's termination—held insufficient to show pretext in light of plaintiff's documented performance issues); *Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 41–42 (2d Cir. 2012) (summary order) (affirming summary judgment for defendants on ADEA claims notwithstanding comment by CEO decisionmaker to plaintiff, six weeks before termination, that plaintiff was "71 years of age, how long do you expect to work" comment held insufficient to show that employer's stated reason for termination was pretext); *Downey v. Adloox, Inc.*, 789 F. App'x 903, 906–07 (2d Cir. 2019) (summary order) (affirming summary judgment for defendants on ADEA claims despite CEO and co-founder's calling terminated plaintiff an "old timer" on two occasions and stating that defendant company was "looking for young sharks").

*Lyons's interpretation*:  Opposing summary judgment, Lyons repeatedly opines about the motivations of others.  For example, in her declaration, she states that "[t]he determined effort by [Crenshaw] to show me in a bad light was because I was being targeted on account of my age," Lyons Decl. ¶ 24.  Her interpretations of remarks do not give rise to show a genuine dispute as to a material fact.  *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 n.5 (2d Cir. 1998) ("[I]f the nonmovant's affidavit . . . is conclusory . . . the affidavit would be insufficient to defend against a motion for summary judgment[.]"); *Meiri*, 759 F.2d at 998 ("The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.").

v.    Evidence weighing against discrimination

Arrayed against the tenuous-at-very-best evidence from which Lyons seeks to infer age-discriminatory intent is the substantial record evidence weighing against a finding of pretextual.  Even viewing the evidence in the light most favorable to Lyons—and assuming *arguendo*, and contrary to what the Court has found, the existence of some evidence of pretext—this evidence so overwhelmingly carries the day as to require entry of summary judgment for NYL.

First, Lyons was hired when she was 48—and thus already in the protected class.  JSF ¶ 22; *Dedyo v. Baker Eng'g N.Y., Inc.*, No. 96 Civ. 7152 (LBS), 1998 WL 9376, at *6 (S.D.N.Y. Jan. 13, 1998) ("For obvious reasons, this fact militates against any finding of age animus.") (citing *Suttell v. Mfr.'s Hanover Tr. Co.*, 793 F. Supp. 70, 74 (S.D.N.Y. 1992)).

Second, Seguin, who hired Lyons, also made the decision to terminate her, Seguin Decl. ¶ 16; JSF ¶ 57; Def. 56.1 ¶ 84; Seguin Tr. at 52, 55–56; McGrath Decl. ¶¶ 10–11.  That is significant, because "[w]hen the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire.'"  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129,

43

137 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997));

*see also Eder v. City of New York*, No. 06 Civ. 13013 (RWS), 2009 WL 362706, at *8 (S.D.N.Y.

Feb. 12, 2009) (citing *Marlow v. Off. of Ct. Admin. of State of N.Y.*, 820 F. Supp. 753, 757

(S.D.N.Y. 1993), *aff'd sub. nom. Marlow v. Off. of Ct. Admin.*, 22 F.3d 1091 (2d Cir. 1994), *cert.*

*denied*, 513 U.S. 897 (1994); *Toliver v. Cmty. Action Comm'n to Help the Economy, Inc.*

*CACHE*, 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985), *aff'd sub nom. Toliver v. Cmty. Action*

*Comm'n*, 800 F.2d 1128 (2d Cir. 1986)).  To be sure, the passage of years between hiring and

firing may weaken that the same actor inference; it "alone cannot support summary judgment . . .

where circumstances could have changed over the course of time." *Carlton*, 202 F.3d at 138

(seven years between hiring and firing); *see also Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d

5, 25 (E.D.N.Y. 2015) (collecting cases).  Nevertheless, this factor weighs against finding

pretext.

Third, Seguin himself was a member of the protected class. *Waters v. Gen. Bd. of Glob.*

*Ministries*, 769 F. Supp. 2d 545, 554 (S.D.N.Y. 2011) ("As many courts have recognized, where

the plaintiff and the individual whose conduct is at issue are members of the same protected

class, the inference that the conduct constitutes harassment or discrimination is weakened.")

(collecting cases so holding).  The age of others in Lyons's supervisory line points in the same

direction.  Civello, to whom Seguin reported at the time of Lyons's termination, and Virendra, to

whom Civello reported, were both then age 47.  JSF ¶¶ 9, 11.  The age of a plaintiff's

supervisors, where also over 40, "undermines any inference of discrimination." *Baguer v.*

*Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393 (RJS), 2010 WL 2813632, at *15 (S.D.N.Y. July 12,

2010), *aff'd*, 423 F. App'x 102 (2d Cir. 2011) (summary order).  Finally, many of Lyons's

colleagues were about the same age or older yet were not terminated. *See* Seguin Decl., Ex. E

(LTCCs employed in 2018 were then ages ranging from age 27 to 69, with an average age of 48, median age of 51, and 11 over age 40). This "obviously undercuts any argument that [Lyons] was the victim of a firm-wide conspiracy to eliminate older workers because of their age." *Dedyo*, 1998 WL 9376, at *7.

In sum, because Lyons has not come forward with evidence that NYL's legitimate non-discriminatory reason for terminating her was pretextual, or that, but for her age, she would not have been terminated, summary judgment for the defense is warranted on her discrimination claim. *See St. Mary's Honor Ctr., et al. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphasis in original). Putting aside conclusory assertions and stray comments disconnected from her circumstances, Lyons has not produced any evidence to show that age discrimination played a role in, let alone was the but-for cause of, her termination.

The Court accordingly grants summary judgment on Lyons's claim of age discrimination under the ADEA.

### 4.  Retaliation

NYL also moves for summary judgment on Lyons's retaliation claim, arguing that she cannot establish a *prima facie* case of retaliation. Lyons argues that she engaged in protected activity and would not have been terminated but for NYL's retaliation for such conduct. NYL is again correct. Even assuming that Lyons could prove a *prima facie* case, which she cannot, she—for the same reasons reviewed above—cannot show that the reasons for her termination were a pretext to cover impermissible motivations.

a.   *Applicable law*

For ADEA retaliation claims, as with discrimination claims under the ADEA, courts follow the familiar burden-shifting approach of *McDonnell Douglas*. *Gorzynski*, 596 F.3d at 110. To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she participated in a protected activity; (2) her participation in the protected activity was known to the employer; (3) the employer thereafter subjected her to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). As with age-discrimination claims, once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. *Gorzynski*, 596 F.3d at 110; *Treglia*, 313 F.3d at 721. If a defendant meets this burden, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *see Gorzynski*, 596 F.3d at 110; *Treglia*, 313 F.3d at 721.

b.   *Analysis*

As to her *prima facie* case, Lyons claims that her protected activity included "objecting to the improper practices of [NYL]" when it discriminated against her; discussing salaries with Seguin; "advocating for a workplace free of discrimination," and "speaking up at various times when Brian Seguin, Ray Singer, and/or Courtney Crenshaw treated [Lyons] differently." Pl. Opp'n at 13. NYL, Lyons argues, was aware of these activities, after which she experienced adverse employment actions, and "her opposition to being treated unfairly on account of her age is what led to retaliation and being terminated sooner than she might otherwise have been." *Id.* at 14. NYL counters that none of her statements or workplace advocacy were connected to her

46

age or any other protected category, and therefore cannot constitute protected activity.  In any event, NYL argues, Lyons has not adduced any evidence causally linking her termination to the activity she terms protected, or sufficient to show that NYL's explanation was pretextual.  Def. Mem. at 15–18; Reply at 8–9.  Both of NYL's critiques are on the mark.

i.    Protected activity

An employee's complaint may constitute protected activity "so long as the employee has a good faith, reasonable belief that the underlying challenged actions violated [anti-discrimination] law." *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001) (internal quotation marks omitted).  Under the ADEA, "a plaintiff engages in protected activity if he has 'a good faith, reasonable belief that he is opposing an employment practice made unlawful by [the ADEA].'" *Lopez v. N.Y.C. Dep't of Educ.*, No. 17 Civ. 9205 (RA), 2020 WL 4340947, at *10 (S.D.N.Y. July 28, 2020) (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006)) (cleaned up); *see also, e.g.*, *Sengillo v. Valeo Elec. Sys., Inc.*, 328 F. App'x 39, 40–41 (2d Cir. 2009) (summary order) (quoting ADEA's anti-retaliation provision, which prohibits discriminatory acts for any individual who "opposed any practice made unlawful *by this section*," 29 U.S.C. § 623(d) (emphasis added), and stating that a plaintiff "must demonstrate that . . . he engaged in protected participation under the ADEA").

Here, however, Lyons has not adduced evidence that she ever complained of the type of discrimination relevant here—age discrimination.  There is evidence that she raised concerns about gender discrimination or general mistreatment.  Recounting her 2015 conversation with Seguin, for example, she states that she had a claim that "the men that were hired from Genworth were paid more than me." Lyons Tr. at 261; *see id.* at 255 (testifying that she asked "why the men that he hired were being paid [$]20,000 more than I was"), 265 ("I asked why men were being paid more than I was . . . he said that only three people knew the salaries of the Genworth

47

guys."). Def. 56.1 ¶ 12. But that statement does not articulate a belief that discrimination on the basis of age was afoot. The other acts or statements to which Lyons points do not evince a connection to age. *See, e.g.*, JSF ¶ 54 (Lyons refused to sign June MOU, but did not mention age); Pl. 56.1 ¶ 118 (Lyons complained that her dashboard was experiencing technical difficulties, but did not mention age); Lyons Tr. at 370 (Q: "Do you recall anything specific that you said to Brian about discrimination between [April 2015 and 2018], anything?" A: "I do not at this moment"). Indeed, although Lyons today asserts that "all of the complained of activity was perpetrated against Lyons on account of her age," she, tellingly, never asserts that, in real time, she complained of age discrimination. *See* Pl. Opp'n at 13.

Accordingly, because Lyons cannot show that NYL "understood or should have understood" any complaints to be based in age discrimination, "she cannot assert retaliation" for complaints of this nature. *Jones v. N.Y.C. Health & Hosp. Corp.*, No. 00 Civ. 7002 (CBM), 2003 WL 30412, at *4 (S.D.N.Y. Jan. 3, 2003), *aff'd*, 102 F. App'x 223 (2d Cir. 2004) (summary order); *see also Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308 (S.D.N.Y. 2009) ("The onus is on the speaker to clarify to the employer that [she] is complaining of unfair treatment due to [her] membership in a protected class and that [she] is not complaining merely of unfair treatment generally."); *Castro v. City of New York*, 24 F. Supp. 3d 250, 270 (E.D.N.Y. 2014) ("Ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.") (quoting *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007)).

### ii.    Causation

Lyons must also show that her protected activity caused her termination, "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory

treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *see Wanamaker*, 108 F.3d at 465 (Title VII and ADEA retaliation claims approached the same way). "[T]he court's role . . . is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citing *Donahoe v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987)).

Here, as noted, the evidence does not reveal any protected activity. Lyons argues that the evidence, in the form of statements by Steve Buell, is that "Brian Seguin and Ray Singer [were] brought on to get rid of the older LTCCs" and this demonstrates NYL's "discriminatory intent and animus." Pl. Opp'n at 14. Even if so, that would not demonstrate retaliatory animus towards Lyons for engaging in protected conduct. Lyons declares that "her opposition to being treated unfairly on account of her age is what led to retaliation." *Id.* But in support, she cites Pl. 56.1 ¶ 112, which asserts that Singer told Buell that Lyons "was on a list of LTCCs to be gotten rid of by the end of that year." Even assuming that Singer had a proper foundation in personal knowledge to so state and that Singer's statement was admissible for the truth of the matter asserted—propositions that Lyons does not establish—this statement does not reveal why Lyons's name was on this list. It does not support that it was there as a result of her having engaged in protected activity (or even on account of her age).

## B.    State Law Claims

Lyons also brings claims of age discrimination, retaliation, and failure to promote under Washington State's anti-discrimination statute—the WLAD.  The Court declines to exercise supplemental jurisdiction over those claims, which are based on a body of law with which this Court does not have experience.

"[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (cleaned up); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.") (citing cases).

Here, considerations of judicial economy and convenience favor letting Washington state courts address Lyons's WLAD claims, should Lyons elect to continue to pursue these claims. The Court has not been pointed to authority that the elements of discrimination and retaliation under the WLAD wholly tracks those of discrimination and retaliation claims under the ADEA, such that entry of summary judgment on the federal claims would dictate the same outcome on the state claims.  Instead, the Court would be obliged to undertake a separate inquiry under the WLAD, both as to the extent of any time bar and as to whether the evidence was sufficient to

51

permit claims under that state statute to go to trial.[29]  And Lyons's separate WLAD claim of a failure to promote lacks any federal analog in this jurisdiction.

Accordingly, the Court declines to exercise supplemental jurisdiction over Lyons's state law claims. *See, e.g., Yagudaev*, 2020 WL 583929, at *15–16 (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment as to ADEA and NYSHRL age discrimination and retaliation claims); *Ehrbar*, 131 F. Supp. 3d at 37 (same); *Adloox*, 2018 WL 5266875, at *9 (same); *see also, e.g., Danner v. Himmelfarb*, 858 F.2d 515, 523 (9th Cir. 1988).  The Court's dismissal of these claims is without prejudice to Lyons's right to refile them in state court.[30]

---

[29] Notably, the Washington Supreme Court has recently clarified that, under the WLAD, a *prima facie* showing of discrimination consists of a plaintiff "showing that (1) she was within a statutorily protected class, (2) she was discharged by the defendant, (3) she was doing satisfactory work, and (4) after her discharge, the position remained open and the employer continued to seek applicants with qualifications similar to the plaintiff." *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 404 P.3d 464, 470 (Wash. 2017) (en banc); *see Kouame v. DAL Glob. Servs., LLC*, 292 F. Supp. 3d 1154, 1160 (W.D. Wash. 2018) (citing *Mikkelsen*, 404 P.3d at 470).  These elements do not fully mirror the elements of a discrimination claim under the ADEA.  Further, the WLAD requires Lyons to prove only that her age was a "substantial factor motivating [NYL's] adverse actions," rather than a but-for cause. *Neely v. Boeing Co.*, No. C16 1791, 2019 WL 2178648, at *4 (W.D. Wash. May 20, 2019) (quoting *Scrivener v. Clark Coll.*, 334 P.3d 541, 545 (Wash. 2014)) (cleaned up), *aff'd*, 823 F. App'x 494 (9th Cir. 2020) (memorandum disposition).  The statute of limitations under the WLAD may also enable Lyons to pursue claims based on facts reaching farther back in time than her ADEA claim permitted. *See Antonius v. King Cnty.*, 103 P.3d 729, 732 (Wash. 2004) (WLAD's statute of limitations is three years).

[30] The Court's jurisdiction over Lyons's state law claims has arisen solely under 28 U.S.C. § 1367(a), as Lyons has not pled or adduced facts under which the Court independently would have diversity jurisdiction to hear these claims under 28 U.S.C. § 1332.  Although the Amended Complaint alleges that Lyons is "based and residing in Washington State" and that NYL is "domiciled in New York State, with its principal place of business in the Southern District of New York," Dkt. 15 ¶¶ 7–9, it does not state where NYL is incorporated or what the amount in controversy is.  And it alleges that the Court has supplemental jurisdiction over Lyons's state law claims under 28 U.S.C. § 1367(a), *id.* ¶ 6, without identifying § 1332 as a separate basis for federal jurisdiction.  Neither side's Rule 56.1 statement fills, or attempts to fill, these gaps.  The Court cannot, therefore, exercise diversity jurisdiction over such claims. *See, e.g., Herrick Co. v.*

### C.     Sealing and Redactions

Documents that are placed before the court by the parties and that are "relevant to the performance of the judicial function and useful in the judicial process" "are subject at common law to a potent and fundamental presumptive right of public access that predates even the U.S. Constitution." *See Mirlis v. Greer*, 952 F.3d 51, 58–59 (2d Cir. 2020) (internal quotation marks and citation omitted).

Here, on its review of the summary judgment record, the Court found documents that were improperly filed under seal or redacted. That is at odds with the principles of public access and transparency. For example, Lyons filed her excerpts of her own and Buell's depositions entirely under seal. *See* Dkts. 150-23, 150-25; Dkts. 159-24, 159-26. And Lyons's 56.1 statement redacts facts that it sources to the (properly) unredacted JSF, and which are publicly referenced elsewhere in the docket. *See* Pl. 56.1 ¶ 90 (citing to JSF ¶ 22).

It is not apparent why any of these materials have not been filed publicly in their entirety. Accordingly, counsel are to confer forthwith about whether there is a justification for the continued redaction of any materials filed in this case, with the exception of Dkts. 76, 78, and 165, filed by NYL, which properly redact only birthdays of the declarant and a non-party. Within two weeks, either (1) these materials are all to be refiled on the docket of this case in unredacted form, in each case by the party who filed them, or (2) to the extent that a party continues to believe redaction is warranted, its counsel is to file a letter with the Court specifically identifying the portions of documents that in its view warrant redaction and stating why; all other documents and portions thereof as to which no continuing claim that redaction is

---

*SCS Commc'ns, Inc.*, 251 F.3d 315, 322–23 (2d Cir. 2001) ("[I]t is well established that '[t]he party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist[.]'") (quoting *Advani Enter., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160 (2d Cir. 1998)) (second alteration in original).

proper are to be publicly filed.  Upon receiving such a letter, the Court will promptly rule on whether the remaining redactions are merited.

## CONCLUSION

For the reasons above, the Court grants NYL's motion for summary judgment as to Lyons's federal claims, all under the ADEA.  The Court dismisses Lyons's state law claims, all under the WLAD, without prejudice to her right to refile these in state court.

Consistent with the discussion above, counsel are to review the materials filed under seal or in redacted form and, within two weeks, either refile these in unredacted form or submit a letter to the Court setting out the bases for any redactions that counsel believes are proper.

The Clerk of the Court is respectfully directed to terminate the motions pending at docket entries 72, 81, and 144, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 21, 2022
       New York, New York

54